MEMORANDUM OF DECISION
On September 29, 1999, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Yvette A. and William W. to their child, Chauncey W., now age three. The termination petition alleges that the parents have abandoned their child. Further, it alleges that Chauncey was previously adjudicated CT Page 986 a neglected child and each of the parents has failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the age and needs of the child, each could assume a responsible position in the life of this child. Connecticut General Statutes § 17a-112(j)(3)(A) and (B). Consolidated with the petition was the respondent father's motion to revoke the commitment and to have custody and guardianship of Chauncey transferred to his mother, the child's paternal grandmother, Ernestine G. Ernestine G. also filed a motion for transfer of guardianship and was granted limited intervention in the termination proceeding to present dispositional evidence. Trial of the case was held on December 26, 29 and January 2, 2001. For the reasons set forth in detail below, the court denies the motion for revocation and for transfer of guardianship as well as the paternal grandmother's motion for the same relief and grants the termination petition.
From the evidence presented, the court finds the following facts:
 A. FACTS
Chauncey was born on August 23, 1997 and is now three years and five months old. At the time of his birth, his mother and father were not married. On his mother's side, Chauncey has six older half-siblings, none of whom were then in Yvette's care. He is the only child known to have been born to this father. The relationship between Chauncey's parents was turbulent and marked with domestic violence and drug use. DCF had been involved with Yvette since 1992 concerning reports of domestic violence, substance abuse and improper supervision of the older children.
The extent of his mother's poly-substance abuse is borne out by this child's medical condition at birth. At his birth, Chauncey tested positive for heroin, cocaine, barbiturates, marijuana, gonorrhea, syphilis and Hepatitis B and C. Chauncey was placed as a medically fragile child in a specialized DCF foster home upon his discharge from the hospital in which he was born, as he required careful monitoring and medication every six hours. He has never been in the day-to-day care of his parents and has been in foster care all of his life. Chauncey was adjudicated a neglected and uncared-for child on October 9, 1997.
1. Yvette A.'s Rehabilitation Efforts
At the time of the neglect adjudication, court expectations were issued for Yvette A.[2] Of these, the most crucial were to visit with her child as often as DCF permitted, not to engage in any substance abuse and to follow the recommendations of the various treatment and service providers. Visitation between Yvette and her newborn son was scheduled to CT Page 987 be weekly initially and then by December, 1997, every other week for one hour. Yvette missed a total of twenty scheduled visits from December 2, 1997 to December 28, 1998. Between January 1999 and the end of April, 1999, Yvette missed seven visits, although at least four were due to her medical condition at that time. After May, 1999, the visits were reduced to monthly. Yvette at that time complained about the Hartford DCF visiting room options, stating that there was often nor a separate room available for the visits. Her position was that she did not want to spend her time chasing Chauncey around the waiting room during her one-hour visitation time.
Beginning in May, 1999, when the visits were reduced to once a month and scheduled in a neutral location such as a park or a restaurant, Yvette was more consistent with visitation. She went to all of her scheduled monthly visits between then and October, 1999. From May, 1999 forward, the visits were scheduled together with three of her older children, also in DCF care. Nonetheless, there were conflicts between the DCF worker and Yvette during visitation and DCF attempted to secure the services of Kidsafe, a supervised visitation program. The program had a waiting list and the visits were to resume there in January, 2000 for two hours every two months. Unfortunately, visits, because of Yvette's incarceration in February, 2000, did not resume until April, 2000 at the York Correctional facility once a month. They have continued to the present time, as Yvette is now in a Department of Corrections half-way house and substance abuse treatment facility, the Neon House.
Given the progress that Yvette had apparently made in the late summer of 1999, another child of hers was reunified with her, although that child remained committed to DCF. Yvette's rehabilitation efforts suffered a severe setback when she was again incarcerated, this time on charges of forgery, credit card fraud and larceny. She pled guilty to these charges and was sentenced. Yvette is a convicted felon, with fifteen separate arrests since 1983. Yvette's most recent incarceration was her first since 1995.[3]
At the time of the commencement of the termination petition in September, 1999, Yvette had attended parenting and individual counseling, although it took several referrals and a considerable period of time until the parenting classes began in June, 1999. Yvette, like many addicts, was unable to remain free of substances. She received many referrals for substance abuse evaluations and for hair testing in 1997.[4] She did not attend any in 1997 and by October, 1999 she still had not completed any hair tests. In June, 1998, Yvette received intensive outpatient treatment at Blue Ridge and completed the program on July 23, 1998. She did not participate in the after-care portions of the program. By October 2, 1998, she tested positive for alcohol CT Page 988 and cocaine again. In July, 1999 at another evaluation, she testified positive for alcohol. When Yvette was incarcerated in February, 2000, she was hospitalized for alcohol withdrawal symptoms.
In addition, Yvette did not comply with her medical care program in taking her medications and attending all her scheduled appointments. Because she receives Social Security disability income, Yvette has, since 1999, had stable housing for herself. She is not employed, given her disability status.
The DCF treatment social worker who was in charge of Chauncey's case from December, 1998 to the present time testified. She noted that Yvette attended approximately one-half of the visitation time provided to her. In the social worker's opinion, Yvette did not regularly inquire about Chauncey's health and well-being. She testified that for the first eighteen months of Chauncey's life, Yvette showed more concern for his physical wellbeing than she has since that time. After that time, she testified that Yvette's concern for Chauncey was minimal.
Yvette strenuously contests DCF's viewpoint concerning her visits and her requests for more time with her youngest child. She testified that she asked about all the children each time she met with the social worker. While she admitted that she did not specifically ask for Chauncey by name, she did inquire about all of them. She also testified that she has never given up hope that she will be reunified with them. She stated she brought gifts to Chauncey a few months ago that were from the previous Christmas. She stated that she had not had any visitation with Chauncey from September 1999 until April, 2000. Her failure to have such visitation, she claimed, was not of her doing, but because DCF was waiting for the visits to be set up at Kidsafe.
Yvette admitted that she was an active addict when Chauncey was born and that it is only now, since she has been at the Neon House that she has begun seriously to deal with her addiction. Yvette had been in Neon House in 1993 and when questioned about what was different this time, she stated that she has learned a lot since then. She has learned in anger management classes that there are other alternatives besides getting angry and using drugs. She now understands that she can ask for help from others. Yvette's primary case manager from Neon House also testified concerning her contact with Yvette. She stated that Yvette came into the program on July 20, 2000. She noted that Yvette helps the other women in the program by baby sitting for their children and that she is affectionate with those children. Yvette had attended the various programs at Neon House that she is required to attend, She is also employed. Yvette's case manager testified that Neon House is a structured setting for the patients and if they do not comply with the program CT Page 989 rules, they are returned to York Correctional Facility.
The court credits Yvette's testimony that she has come to understand some of her past life difficulties and now, in a structured setting where she has remained sober, is beginning to know what steps she must take to lead a productive life. However, the testimony of Robert B. Meier, the court appointed psychologist evaluator, is also compelling. He noted that Yvette's sobriety has not yet been tested in the community. He testified that in his professional opinion, past behavior is the best predictor of future behavior. Before he would consider that Yvette had rehabilitated sufficiently so that a child could be reunified with her, she would have to have been sober and in the community on her own for at least one and one-half years. Unfortunately, he noted, given Chauncey's age and needs for permanency, this child cannot wait that long for permanency in his young life. Having a permanent, consistent and stable home and family are the most important needs that Chauncey has.
Dr. Meier noted that Yvette's past behavior showed that she lacked judgment and that she had poor impulse control. At that time of her incarceration in February, 2000, she had a child in her care who had earlier been returned to her and this had not been enough to deter her from a relapse and further criminal behavior. He noted that her prognosis, in view of her past behavior, was very poor. If Chauncey had to wait for this length of time for permanency, he would at that time have been in foster care for five years. Dr. Meier testified that the professional studies on long term foster care placement recommend that a child not be in foster care more than a year until there is permanency, if that child was placed in foster care prior to the age of one year. Further, he noted the recommendations state that such placement should not be for more than two years for a child placed after the age of two. Chauncey has already been in foster care for more than three years, beyond the time lines suggested by the professional research. Dr. Meier testified that lengthier stays in long term care impact upon the levels of trust a child develops with his adult caretakers and the bond that grows between them. His professional opinion was that Chauncey required permanency outside of the biological family soon.
2. William W.'s Rehabilitation Effort
William, like Yvette, is a convicted felon. He has a somewhat lengthier criminal record than does Yvette. At the time of the trial, he had been incarcerated since October, 1998 and believed that he, too, would soon be in a half-way house. He is an admitted drug user of many years standing, who has stated that he has used cocaine for over ten years. He does not claim to be in a position to care for Chauncey at the present time. He filed, shortly after the commencement of the termination petition, a CT Page 990 motion for revocation of commitment and motion to transfer guardianship of Chauncey to his mother, Ernestine G.
Like Yvette, William was given expectations on October 9, 1997 as to what he needed to do to have his child returned to him. Crucial among those expectations were the need to refrain from the use of illegal drugs, to address and receive treatment for his substance abuse, to attend individual and anger management counseling and to visit with his son as often as permitted.[5] William was referred by DCF to substance abuse evaluations and treatment at the Morris Foundation. Parenting and anger management were offered to him through the Waterbury Youth Services programs. Although William was offered biweekly visitation in 1997, he had his first visit in January, 1998. He, like Yvette, completed less than one-half of the visits scheduled, although some did not take place when Chauncey was ill. From approximately May, 1998 until the time of his incarceration in October, 1998, DCF did not know William's location. Once he was located in a correctional facility, DCF arranged for monthly visits by Chauncey from November 1998, until May, 1999, when visits were ended.
William testified at trial about what he has learned this time while incarcerated. He has not had any disciplinary tickets issued during this time in jail. He has attended a number of programs, including substance abuse programs. He was very proud of his vocational training to become a plumber and hopes to be able to secure employment as an apprentice plumber, once discharged by the Department of Corrections. William testified to the visits he has had with Chauncey while he had been incarcerated and how he has worked hard to develop a relationship with his son. He wants very much, once released, to make a home for him. Until that time, he believes that his mother is more than capable of providing for Chauncey.
The DCF social worker testified that William had not had much contact with her to inquire about Chauncey nor to learn about his specialized needs and his medical condition. She noted that he had sent some cards and letters to Chauncey through DCF. She stated that Chauncey, over time, learned to recognize his father during the prison visits. She testified that often she would have to encourage Chauncey to go to his father and direct him, as he would constantly come back to her. In her opinion, there was no bond between Chauncey and his biological father, given the little time that they had spent with each other. She also testified that when he is not going to and from visitation, Chauncey does not ask about his biological father.
Dr. Meier evaluated William W. as well as Yvette and was able to observe William with his son. His concerns about William mirrored his CT Page 991 concerns about Yvette. He noted that William had demonstrated a pattern of substance abuse since his mid-adolescent years and that he is now thirty-six years old. "He has had a pattern of problems with the law, impulsiveness, lapses of judgment and underachievement at school." He testified that "often such an individual goes through a period of time when he shows regret and a desire to change, but that such behavior does not usually change." He stated that "he would not be able to provide for the child now or in the near future, given this pattern, it would not be likely in the foreseeable future."
3. The Child, Chauncey W.
Chauncey, as noted, had some significant medical issues when he was born which required close monitoring for the first eighteen months of his life. By the time he was two years old, he was no longer labeled "medically fragile." He had also suffered from asthma as an infant and the severity of his asthma has also subsided over time. Unfortunately, his first two foster mothers developed significant medical difficulties of their own, which required Chauncey's move to another home. He is now in his third foster home placement, where he has been since August 20, 1999. His present foster mother wishes to adopt him, should he become free for adoption.
The DFC social worker testified that Chauncey is now over three years old and looks five years old, He is a handsome, very bright and active youngster. He has overcome significant medical odds and is now in good health. She noted that he has made slow progress with his speech and language difficulties and is now in a Headstart preschool program. She testified that he has close relationship to his foster mother who has provided nurturing care to him for over a year. She noted that he requires a great deal of structure and consistency. She believes that he requires permanency soon, to grow and learn in a family committed to him, so that he can lead a productive life.
Chauncey's "Birth to Three" special education teacher testified concerning his speech, which was delayed. Ms. Rocco stated that she worked with Chauncey for a period of ten months, just after he was about two years old. When she first began to work with him in the program, he would communicate by screaming, kicking and biting. After a time, Chauncey began to communicate in different ways. She testified that she observed his behavior on several occasions after he reportedly had visitation with his parents. She observed that after those visits Chauncey seemed very anxious, he had difficulty in attending to the tasks that were set for him and he was easily frustrated. When he turned three, she completed her work with him, although she observed that he still required speech and language help. CT Page 992
Dr. Meier did not formally evaluate Chauncey, but he had the opportunity to observe the child with his mother, his father, his foster mother and his paternal grandmother. Dr. Meier noted that when he saw the child in July, 2000, he was quiet and not very communicative. He was of the opinion that neither of the biological parents was Chauncey's psychological parent. He noted that Chauncey had no difficulty separating from either of them.
3. The Guardianship Request of Ernestine G.
Ms. G. claims that she is a fit and appropriate person to have guardianship of Chauncey and that DCF has not adequately investigated her as a potential relative placement resource for Chauncey.[6] The court concludes from the evidence that DCF met its statutory mandate and also the court's direct order regarding Ernestine G.[7] on two occasions, DCF social workers went to the grandmother's residence, once in 1997 and once again in 1999. On each occasion, they provided Ms. G. a release form to complete so that DCF could obtain her medical records and speak with her physicians. This form she gave to one of her granddaughters to help her to complete. For various reasons, the form was never completed and returned to DCF. Ernestine also testified that she felt the previous DCF social worker was not respectful to her and that she had difficulty getting along with her. As a result of this poor relationship, Ernestine took no further steps to contact DCF about Chauncey's placement and the completion of a home study. Also as a result, DCF was never able to secure the necessary medical information and did not proceed further in considering Ernestine as a relative foster parent for Chauncey. There is no doubt that Ernestine G. suffers from high blood pressure, diabetes and narcolepsy, conditions which could potentially impact her ability to care for any child. It is these medical conditions that DCF sought to investigate.
DCF was aware that Mrs. G. receives Social Security disability income as a result of her medical conditions, a finding made under the federal statutes that she cannot maintain gainful employment, due to these conditions. Nonetheless, there was considerable testimony from one of her daughters, two of her granddaughters that she cares for several of her great-grandchildren on a daily basis in her home. At the present time, one of her granddaughters and a great-grandchild resides with her. In addition, there was testimony from her granddaughter that she helps Ernestine make her doctors' appointments, reminds her of them and helps to organize her medications, although Ernestine is able to take her medications herself.
The physician from St. Joseph's hospital who saw Ernestine at the CT Page 993 clinic there testified that all of Ernestine's conditions were controllable by medication. He admitted that on two occasions in the past year when Ernestine had come to the clinic, her blood pressure was elevated, as she had not been taking her medication, the prescription for which needed refilling. Ernestine herself testified that she does not take her medication for narcolepsy daily, as it is prescribed, because she does not need it. The medical records and the testimony reflect that there have been no known episodes of day-time sleeping which have compromised the care of the children in Mrs. G.'s charge. She noted that she had been diagnosed with narcolepsy when she was twelve years old and had been dealing with it all her life.
Mrs. G. wants very much to care for her great-grandson Chauncey, believing that she is capable of doing so, as he is a member of her family who should not be lost to the family. Mrs. G. has had some contact with Chauncey during visitation with the parents. She attended two interactional sessions with Chauncey and Dr. Robert Meier. In his report of the first of these sessions, Dr. Meier reviewed Mrs. G.'s history and noted that she had attended school through the seventh grade. She had reported that she had bad asthma, missed a lot of school and then left school when she became pregnant. "She admitted that she had some problems with reading, but felt that she knew enough to make good judgments while raising her children."
At the first session Dr. Meier noted that Ernestine "was able to gain the child's trust and attention quickly. During the session it was clear that she was aware of setting limits, safety issues, and the needs of the child of this age." During his testimony, Dr. Meier observed that Chauncey was quiet and generally not very responsive in the first interactional session. In a report from the second session held on Nov. 29, 2000, Dr. Meier noted:
"Chauncey played with grandmother, and had more room to move around and even get into things than he had during the previous assessment at the court in Middletown. It became evident that grandmother had difficulty setting limits for him, redirecting him or getting him to respond to her requests. She showed limited awareness of and understanding of any special needs, attributing his behavior to his being upset that not being with his family . . . Given this interaction in a more open setting, it became more evident that grandmother would have difficulty keeping up with the child physically, would have trouble setting limits, and would have difficulty clearly understanding his needs for treatment or other CT Page 994 interventions.
As previously noted, Dr. Meier believed that this child needed permanency soon, outside the biological family.
The court was able to observe Ernestine G. while she presented her dispositional evidence in the termination case. The court believes that Ernestine has Chauncey's best interests at heart and wishes to care for the child. The court finds that she has demonstrated her concern for this child from the time he came into foster care and she is to be acknowledged for her efforts. Nonetheless, the court had an opportunity to observe and consider Ernestine's abilities as she testified. "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Solomom v. Aberman,196 Conn. 359, 379, 493 A.2d 1933, (1985), Dadio v. Dadio, 123 Conn. 88,92-93, 192 A. 557 (1937); see Christie v. Eager, 129 Conn. 62, 64-65,26 A.2d 352 (1942). The Dadio court stated that:
 "Findings based upon these observations in the courtroom are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of witnesses." Dadio v. Dadio, supra, p. 93.
From that evidence, the court concludes, as did the court-appointed psychological evaluator, that Ernestine's limitations would prevent her from being able to deal effectively with Chauncey's specialized needs and in advocating for the services that he requires to grow and prosper. The court concludes, from the clear and convincing evidence, that it is not in this child's best interests to be placed in the day-to-day care of his great-grandmother, with whom he does not have a bond. For all of the foregoing reasons, the court denies the grandmother's motion for transfer of guardianship.
 B. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such a finding is not CT Page 995 required if the court has determined at a hearing . . . that such efforts are not appropriate. Connecticut General Statutes § 17a-112(j)(1). The court made such findings on September 29, 1998 as to both parents. The court does find, from the clear and convincing evidence that reasonable reunification efforts had been made prior to the date of these findings. The court also finds that DCF continued to make reasonable reunification efforts after the findings. The court finds that the parents have taken, while incarcerated and in institutional settings, some steps to deal with their drug addictions, but that neither of them has rehabilitated sufficiently so that they could be reunified with Chauncey in the foreseeable future.
2. Adjudicatory findings
 (a) Failure to Rehabilitate:
Chauncey was adjudicated neglected on October 9, 1997 and committed to the care and custody of DCF. The clear and convincing evidence established that, by September 29, 1999, the adjudicatory or filing date of the termination petition, by which their rehabilitation must initially be measured, neither parent had achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of their child, either could assume a responsible position in his life. Connecticut General Statutes §17a-112(j)(3)(B). Neither of the parents fully participated in the services offered to them. Neither was able to remain drug or alcohol free or to refrain from further criminal conduct. While each has made progress while incarcerated, the tenuous recovery steps each has taken are still untested in the community.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167,554 A.2d 722 (1989), In re Hector L., 53 Conn. App. 359, 366-367,730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Yvette and William's conduct prior to the filing of the petition, but also their conduct since that time. In this case, this was a period of a year and three months, during which time there has been some improvement in their sobriety and in their participation in services. CT Page 996
Chauncey clearly requires stability and permanency, which he has found in the home of his foster mother. He is attached to her and has now lived with her for more than one year. The foster mother, the court finds from the evidence, has been able to provide for this child's special needs and is committed to his care, which remains challenging. His foster mother has demonstrated that she can advocate for his needs in the past and the court does not doubt that she will be able to do so in the future.
While both Yvette and William have expressed their sincere desire to turn their lives around, whether they will be able to do so remains a hope for their future. The court accepts the testimony of the evaluator that at least another one and a half years of sobriety as well as a crime-free life will be required before Chauncey could be reunited with them. Unfortunately. Chauncey cannot wait any longer. To remain in limbo for that length of time to see if his parents can become productive citizens, is not in his best interests. He has already been in foster care for the past three years. during which time his biological parents, until forcibly restrained, continued to use drugs, consume alcohol to excess, and engage in criminal behavior.
(b) Abandonment
The court finds that both Yvette A. and William W. have abandoned their son, within in the legal meaning of that term. While his father testified that this child is important to him and that he would like to be his father and care for him, he has not behaved in a way which lends credence to his words. He has had visitation while incarcerated. Prior to his incarceration, his involvement was sporadic and minimal. From May, 1998 until October, 1998, even his whereabouts were not known to DCF. He was at liberty to be as actively involved with the child as possible, to inquire about him as well as to send him cards, letters and gifts, none of which he chose to do. He could have attended parenting classes and dealt with his drug addiction actively. It was only after his incarceration that his contact with his son increased with monthly visits.
However, [the abandonment statute] "does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." In re Kezia M., 33 Conn. App. 12, 18. 632 A.2d 1122
(1993). "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) In re MichaelM., 29 Conn. App. 112, 614 A.2d 832 (1992); In re Rayna M.,13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, (1986). The court finds, from CT Page 997 the clear and convincing evidence that as of September 29, 1999, Chauncey had be abandoned by his father.
Yvette exhibited much the same behavior as did William. While she visited more frequently, she too did not take consistent and sustained efforts to know her son and to continue to be involved in his life. The court credits the DCF testimony that after his first eighteen months of life, Yvette was less involved with Chauncey than she had been previously. Instead of taking advantage of the Opportunities available to her, such as visiting him in the DCF offices until better arrangements could be made through Kidsafe, she did not visit at all. The court finds, from the clear and convincing evidence, that she, too, has abandoned the child and has only shown sporadic and inconsistent interest in him.
 C. REQUIRED STATUTORY FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(k).
1) Appropriate and timely services were provided by DCF to the family. These include services to benefit Chauncey as well as referrals for these parents to deal with issues of parenting, substance abuse and anger management. DCF also provided visitation and case management services to the parents.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and that the parents were unable to benefit from them. In addition, the court found on October 9, 1998, that further efforts for reunification were not appropriate.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court has previously reviewed the court-ordered specific steps set for both of the parents and finds that neither was able to fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Chauncey has had a visiting relationship with each of his parents, neither of who has ever provided his day-to-day care. He has no identifiable connection to his paternal grandmother. He is closely connected to his foster mother, who is his psychological parent. He has prospered in his present placement. CT Page 998
5) Finding regarding the age of the child: Chauncey is three years and four months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that neither Yvette nor William has demonstrated the necessary personal changes for a long enough period of time to accommodate the care and nurturing of this child.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for a number of years to assist this family.
 D. DISPOSITION 1. The Respondent Father's Motion for Revocation of Commitment and Transfer of Guardianship.
The court must consider Chauncey's best interests as to the issues raised by the request for transfer of guardianship to the paternal grandmother, the alternative disposition plan offered by William. The legal issue in this revocation hearing is whether or not a cause for the "commitment" of the child still exists. General Statutes (Rev. to 1995) § 46b-129(g), now § 46b-129(m), provides in relevant part: "Any court by which a child . . . has been committed pursuant to the provisions of this section may, upon the application of a parent . . . upon finding that cause for commitment no longer exists, revoke such commitment. . . .' Our Appellate court recently held:
"The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. On this point, when it is the natural parents who have moved to revoke CT Page 999 commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." In re Cesar G., 56 Conn. App. 289, 292, 742 A.2d 428 (2000), In re Juvenile Appeal (Anonymous), 177 Conn. 648, 659, 420 A.2d 875 (1979), In re Thomas L., 4 Conn. App. 56, 57, 492 A.2d 229 (1985).
The court concludes causes for the commitment of Chauncey remain, as of the close of the trial in this matter. William was still incarcerated for a crime committed in 1998. He had not complied with the specific steps issues for him during the neglect proceedings and the underlying issues of drug abuse and criminal behavior remain unchanged. Whether Williams' enforced sobriety within the confines of prison will continue, once he is in the community at large, remains unknown.
2. Chauncey "s Best Interests
The next inquiry, then, is what is in Chauncey's best interest. That is the same inquiry that the court must make concerning the termination petition.
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
In this case, the court has found that the grounds alleged for termination of the parental rights of the biological parents of Chauncey has been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in this child's best interests. The court concludes, from the clear and convincing evidence that Chauncey cannot wait any longer for permanency. The court also concludes, from the testimony, that it would be detrimental for Chauncey to be in the primary care of his grandmother. CT Page 1000
Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Chauncey to have permanency and stability in his life. Accordingly it is in his best interests that his parents' rights to him be terminated.
The court therefore orders that a termination of parental rights enter with respect to Yvette A. and William W. Chauncey's foster mother has expressed a desire to adopt Chauncey and the court directs that she be given first consideration in any adoption, as is presently the DCF plan for Chauncey. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The court further orders that a permanency plan for Chauncey and a review plan for him be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session